612-07/EEL/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff FLOPEC
80 Pine Street
New York, New York 10005
(212) 425-1900
Eric E. Lenck (EL 4547)
Pamela L. Schultz (PS 8675)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
FLOTA PETROLERA ECUATORIANA,

Plaintiff,                    08 CV

-    against –

TURKISH PETROLEUM INTERNATIONAL    **VERIFIED COMPLAINT**
CO. LTD.,

Defendant.
--------------------------------------------------------x

Plaintiff, FLOTA PETROLERA ECUATORIANA (hereinafter "FLOPEC"), by

its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against the

named Defendant TURKISH PETROLEUM INTERNATIONAL CO. LTD. (hereinafter

"TPIC") alleges upon information and belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure in that it involves claims for breach of maritime

contracts of charter party. This case also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the

Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 and the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff FLOPEC was and still is a foreign

business entity duly organized and existing under the laws of a foreign country with an

NYDOCS1/310706.1

612-07/EEL/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff FLOPEC
80 Pine Street
New York, New York 10005
(212) 425-1900
Eric E. Lenck (EL 4547)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
FLOTA PETROLERA ECUATORIANA,
                              Plaintiff,            08 CV

        -    against –

TURKISH PETROLEUM INTERNATIONAL          **VERIFIED COMPLAINT**
CO. LTD.,
                              Defendant.
--------------------------------------------------------x

        Plaintiff, FLOTA PETROLERA ECUATORIANA (hereinafter "FLOPEC"), by

its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against the

named Defendant TURKISH PETROLEUM INTERNATIONAL CO. LTD. (hereinafter

"TPIC") alleges upon information and belief as follows:

        1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure in that it involves claims for breach of maritime

contracts of charter party.  This case also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333.  Jurisdiction is also proper pursuant to the

Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 and the Federal

Arbitration Act, 9 U.S.C. §1 *et seq*.

        2.    At all times relevant hereto, Plaintiff FLOPEC was and still is a foreign

business entity duly organized and existing under the laws of a foreign country with an

address at Av. Amazonas 1188 y Cordero, Edificio Flopec, Apartado 535-A, Quito, Ecuador.

3.    At all times relevant hereto, Defendant TPIC was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at Sogutozu Cad. No. 27, 06520 Sogutozu/Ankara-Turkey.

### THE MAYA CHARTER PARTY

4.    On or about November 23, 2007 Plaintiff FLOPEC, in the capacity as owner of the M/V MAYA, entered into a maritime contract of charter party on an Asbatankvoy form with Defendant TPIC for the carriage of a cargo of a minimum of 50,000 metric tons of oriente crude oil in charterers' option.  A copy of the subject charter party is annexed hereto as **Exhibit A.**

5.    Under the terms of the charter, TPIC was to provide a performance guarantee by November 27, 2007.

6.    In breach of the terms of the charter party, TPIC failed to provide the performance guarantee as required and the charter party was cancelled by mutual agreement with FLOPEC reserving its rights to claim damages.  The vessel had already commenced performance by proceeding to the load port.

7.    In order to mitigate its damages for TPIC's failure to perform under the charter as required, Plaintiff FLOPEC immediately sought substitute employment for the vessel.

8.    After successfully obtaining substitute employment for the vessel, Plaintiff FLOPEC submitted an invoice to TPIC for the amounts due and owing as a consequence of the breach, which consisted of detention in the amount of $87,959.37 and extra

consumption of bunkers in the amount of $7,626.20, for a total of $95,585.57 for the amounts due and owing under the charter party. A copy of that invoice is attached as **Exhibit B**.

9.    Despite due demand, the invoice remains unpaid and the entire amount is due and outstanding.

## THE CHIMBORAZO CHARTER PARTY

10.    On or about November 23, 2007 Plaintiff FLOPEC, in the capacity as owner of the M/V CHIMBORAZO, entered into a maritime contract of charter party on an Asbatankvoy form with Defendant TPIC for the carriage of a cargo of a minimum of 50,000 metric tons of oriente crude oil in charterers' option. A copy of the subject charter party is annexed hereto as **Exhibit C**.

11.    Under the terms of the charter, TPIC was to provide a performance guarantee by November 27, 2007.

12.    In breach of the terms of the charter party, TPIC failed to provide the performance guarantee as required and the charter party was cancelled by mutual agreement with FLOPEC reserving its rights to claim damages. The vessel had already commenced performance by proceeding to the load port.

13.    In order to mitigate its damages for TPIC's failure to perform under the charter as required, Plaintiff FLOPEC immediately sought substitute employment for the vessel.

14.    After successfully obtaining substitute employment for the vessel, Plaintiff FLOPEC submitted an invoice to TPIC for the amounts due and owing as a consequence

of the breach, which consisted of detention in the amount of $223,146.88 and extra consumption of bunkers in the amount of $17,010.00, for a total of $240,156.88 for the amounts due and owing under the charter party. A copy of that invoice is attached as **Exhibit D**.

15. Despite due demand, the invoice remains unpaid and the entire amount is due and outstanding.

16. Both charter parties are governed by U.S. law and all disputes between the parties are to be resolved by arbitration in New York, where Plaintiff has already demanded arbitration. Plaintiff FLOPEC reserves the right to have the substantive aspects of these matters determined in arbitration.

17. Attorney fees and arbitrators fees are recoverable as an item of claim under the terms of the charter parties.

18. Plaintiff estimates, as nearly as can be computed, that the anticipated attorney fees and costs (including arbitrators' fees) to arbitrate the claims arising under the two charter parties will be $75,000, and that interest on the claim will accrue in the sum of $71,607.15 (computed at the rate of 8% through the completion of the arbitration in approximately two years).

19. This action is brought to obtain security in favor of Plaintiff in respect to its claim against Defendant TPIC in aid of arbitration and for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the arbitration and interest as outlined above.

20. Upon information and belief, and after investigation, Defendant TPIC as identified in this action cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), moving through banking institutions and/or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff prays:

a.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant TPIC, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.  That since Defendant TPIC cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant TPIC (as identified herein) up to and including the sum of $482,349.59, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant TPIC (as identified herein) at, moving through, or within the possession, custody or control of banking institutions and/or any other

garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served; and

c.    That an Order be entered directing Defendant TPIC to proceed to arbitration for the adjudication of the merits of the claims;

d.    That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and

e.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       August 15, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff


By: _____
    Eric E. Lenck (EL 4547)
    Pamela L. Schultz (PS 8675)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900
    (212) 425-1901 fax

## **ATTORNEY VERIFICATION**

State of New York      )
                       ) ss.:
County of New York  )

ERIC E. LENCK, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
ERIC E. LENCK

Sworn to before me this
[5th] day of August 2008.

_____
Notary Public

MARTHA L. BROWN
Notary Public, State of New York
No. 01BR6067399
Qualified in Kings County
Certificate Filed in New York County
Commission Expires December 10, 2009

Charles R Weber


TO: FLOPEC
ATTN: PILAR/TANIA/MARTHA/ZANDRA

TPIC ORIENTE CGO'S 28-30 NOV

WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE ACCOUNT TPIC WITH ALL
SUBJECTS LIFTED ABD CP DATED TODAY
NOV 23,2007 TERMS AND CONDITIONS AS FOLLOWS


MT MAYA  O/O  SUITABLE SUB- TURKISH PETROLEUM - LAYCAN NOV 28-30, 2007 -
ORIENTE CRUDE

CHARTER PARTY DATED: NOV 23,2007

BROKER:        CHARLES WEBER

OWNERS: FLOPEC
             AV. AMAZONAS 1188 Y CORDERO
             EDIFICIO FLOPEC
             APARTADO 535 - A
             QUITO, ECUADOR
             PHONE 593-22-509-703
             E-MAIL: chartering@flopec.com.ec

CHRTRS:   Turkish Petroleum International Co.Ltd
             Registered Address of TPIC
             15 Esplanade St. Helier,
             Jersey Je1 Rb Channel Islands

        OFFICIAL DOCUMENTS SHOULD BE SENT TO
        Communication Adress of TPIC
        Sogutozu Cad. No: 27 06520
        ANKARA/TURKIYE



fax: 00 90 312 285 38 09

MT MAYA  OWNER OPTION SIMILAR SUITABLE SUBSTITUTE SUBJECT TO
CHARTERERS / SUPPLIERS/RECEIVERS APPROVAL, WHICH NOT TO BE UNREASONABLY
WITHHELD. ANY CHANGES MUST BE MADE WITH SUFFICIENT TIME IN ORDER TO
ALLOW
CHARTERERS TO OBTAIN TRAFFIC PERMISSION.


VESSEL PARTICULARS:

VESSEL: MAYA
EX-NAME: NONE
SDWT: 68439 METRIC TONNES
SDRAFT: 13.217 METRES
LOA: 228.54 METRES
BEAM: 32.2 METRES
FLAG: GREECE
BUILT: Jan 24, 2003
CLASS: LLOYDS REGISTER
STOPPERS: 2 x 200 METRIC TONNES -
TONGUE CHAIN SIZE: 76 MILLIMETRES
CUBIC 98 PCT: 77889.2 CU. METRES
SLOP 98 PCT: 2167.89 CU. METRES
SEGREGATIONS: 3
PUMPS: 6 x 2000 CU. METRES/HOUR (CENTRIFUGAL)
TPC / TPI: 66.43 METRIC TONNES / 168.732 METRIC TONNES
BCM: 115.5 METRES
KTM: 47.025 METRES
IGS: YES
COW: YES
SBT/CBT: SBT
VRS: YES
GRT:39085
NRT: 19936
PCNT:32321
SCNT: 37083.1
DERRICK/CRANE: CRANES: 1 x 15 TONNES
COATED: PURE EPOXY
HULL:  DOUBLE HULL
CALL SIGN: SYXG
P AND I: UK P&I CLUB
QUALIFIED IND: O´BRIEN'S OIL POLLUTION SERVICES
OSRO: NRC
COC/TVEL:N/A
ISPS: MAY 03, 2009

APPROVALS: TO THE BEST OWNERS KNOWLEDGE AT THE CURRENT TIME THE VESSEL IS
ACCEPTABLE TO THE FOLLOWING MAJORS: CONOCO, EXXON, SHELL, REPSOL, CHEVRON

Q.I.
O'BRIEN' OIL POLLUTION SERVICES INC.
645 CODIFER STREET
SLIDELL, LA

2/13/2008

USA.
TEL: 1-985-781-0804
FAX: 1-609-275-9444
EMAIL:  OOPS-USA@OOPSUSA.COM

OSRO
NATIONAL RESPONSE CORP.
3500 SUNRISE HIGHWAY,
SUITE T-103
GREAT RIVER ,
NY 11739
USA
TEL: +1 800 899 4672
FAX: +1 631 224 9086
EMAIL:  IOCD@NRCC.COM

LAST 3 CARGOES:       ORIENTE / CRUDE / FUEL
LAST 3 CHARTERERS:    ST SHIPPING / REPSOL / GLENPOINT

LADEN SPEED: ABOUT 14 KNOTS WSNP

POSITION: OPEN LONG BEACH ABOUT NOV 18, 2007. ETA ESMERALDAS NOV 27, 2007, AGW WP
AND UNEXPECTED CIRCUMSTANCES EXCEPTED.


---------------------CARGO--------------------------------

CARGO: P/C MIN 50,000 MTS CHOPT TO COMPLETE UP TO FULL CARGO ORIENTE CRUDE
OIL AND ALWAYS CONSISTENT WITH SAFE PANAMA CANAL TRANSIT DRAFT,
MAXIMUM TWO
GRADES WITHIN VESSELS NATURAL SEGREGATION, NO HEAT REQUIRED. NO
DEADFREIGHT
CHARTERERS ACCOUNT PROVIDED MINIMUM QUANTITY SUPPLY.


IF DISPORT SAN FRANCISCO, VSL IS ABLE TO LOAD ACCORDING TO MASTER'S
CALCULATIONS ALWAYS CONSISTENT WITH CURRENT SAFE ARRIVAL DRAFT TO S.F.
PINOLE SHOALS, WHICH WILL BE PROVIDED BY CHRTRS TO OWNERS/MASTER IN DUE
TIME, IN
ORDER MASTER CAN PROCEED WITH RESPECTIVE CALCULATION.

-------------------------------------------------------------
- LAYDAYS:  NOVEMBER 28-30, 2007

- LOAD PORT: 1 SP ESMERALDAS


- DISCHARGE PORT:1/2 SP USWC (L.A - S.F. RANGE) OR CHOPT
          1/2 SP USAC IF NY NNGWB EX FLA OR IN CHOPT
          1/2 SP USG EX FLA OR IN CHOPT
          1/2 SP CARIBS EX C/O/H OR IN CHOPT

AND IN A FORMAT AND IN A WORDING ACCEPTABLE TO FLOPEC.

CHARTERERS ARE TO PROVIDE THIS GUARANTEE NOT LATTER THAN 1200 HRS TUESDAY
NOV 27,2007. ANY TIME SPENT WAITING FOR THE LOC, AFTER THE COMMENCEMENT OF THE
LAYCAN AND PROVIDED THE VESSEL IS IN ALL RESPECTS READY TO LOAD, SHALL COUNT
AS USED LAYTIME OR AS DEMURRAGE IF VESSEL IS ON DEMURRAGE.

THIS PERFORMANCE BOND (IRREVOCABLE, UNCONDITIONAL BANK GUARANTEE) WILL BE
VALID UNTIL THE FULL AMOUNT OF FREIGHT AND DEMURRAGE, IF ANY IS PAID,
AFTER WHICH IT WILL BECOME NULL AND VOID.

CHARTERERS CAN NOT ASSIGN ALL OF ITS RIGHTS AND OBLIGATIONS UNDER THIS
CHARTER PARTY TO ANY AFFILIATE WHICH MAY IN TURN REASSIGN TO ANY OTHER AFFILIATE.
CHARTERERS TURKISH PETROLEUM INT.CO.LTD (TPIC) ALWAYS TO REMAIN RESPONSIBLE
FOR THE FULFILLMENT OF THIS CHARTER PARTY.

- ELETSON WAITING INSTRUCTION CLAUSE

CHARTERERS TO HAVE THE OPTION TO REQUIRE VESSEL TO WAIT FOR ORDERS FOR A
MAXIMUM OF TWENTY (20) DAYS AT ANCHORAGE AT MASTER'S DISCRETION, WITHOUT
PREJUDICE TO ANY CLAIM OWNERS MAY HAVE FOR DEVIATION. ALL TIME FROM ARRIVAL
AT ANCHORAGE UNTIL DEPARTURE TO BE PAID AT THE AGREED DEMURRAGE RATE FOR THE
FIRST 10 DAYS AND 35,500 USD PDPR FOR THE 2ND 10 DAYS , PLUS EXTRA BUNKERS
CONSUMED (FUEL OIL FOR MAINTAINING CARGO TEMPERATURE AND DIESEL OIL) TO BE PAID
TOGETHER WITH THE FREIGHT AGAINST OWNERS E-MAILED INVOICE.

SHOULD IT BE NECESSARY FOR VESSEL TO STEAM WHILST AT THE ANCHORAGE AREA THEN
TIME AND ADDITIONAL BUNKERS CONSUMED IN THIS RESPECT TO BE FOR CHARTERERS
ACCOUNT AND TO BE PAID AS ABOVE AGAINST OWNERS E- MAILED INVOICE. AFTER THE
EXPIRATION OF TWENTY (20) DAYS OWNERS HAVE THE OPTION TO NEGOTIATE ABOVE RATE.

- C/P FORM: ASBATANKVOY

SPECIAL PROVISIONS:

---------------------

- WSHTC TO APPLY

- NEW YORK / US LAW TO APPLY THROUGHOUT THIS CHARTERPARTY


- CP SPEED - VESSEL TO PERFORM LADEN PASSAGE AT 14 KNOTS WSNP

- OWNERS WILL HAVE THE OPTION TO LOAD BUNKERS DURING VESSEL'S LADEN
PASSAGE
ALWAYS SUBJECT TO CHARTERERS PRIOR APPROVAL WHICH NOT TO BE
UNREASONABLY
WITHHELD

- CHARTERERS TURKISH PETROLEUM INTERNATIONAL CO LTD ALSO WILL PAY
LIGHTHOUSE
AND BUOY DUES (24 CENTS PER GRT) AND CARGO DUES ASSESSED ON THE QUANTITY
OF
CARGO LOADED (5 CENTS PER BBL)

- TOTAL LAYTIME IN RUNNING HOURS 72

- ALL COST FOR LIGHTERING EQUIPMENT SHALL BE FOR THE ACCOUNT OF TURKISH
PETROLEUM INTERNATIONAL CO LTD, IF ANY

- ESCORT TUGS IF REQUIRED TO BE AS PER WSHTC

- L.O.I. AS PER OWNER'S P&I CLUB WORDING

- OWNERS AGENTS AT LOAD PORT, CHARTERERS AGENTS AT DISPORT ALWAYS
PROVIDED
COMPETITIVE FEES.

- OWNERS WARRANT THAT THEY ARE AWARE OF THE REQUIREMENTS OF THE U.S.
BUREAU
OF
CUSTOMS AND BORDER PROTECTION ISSUED ON DECEMBER 5TH. 2003 UNDER
FEDERAL
REGISTER PART II DEPARTMENT OF HOMELAND SECURITY 19 CFR PARTS 4, 103, ET AL.
AND WILL COMPLY FULLY WITH THESE REQUIREMENTS FOR ENTERING U.S. PORTS,
SUBJECT
TO CHARTERERS COOPERATION, WHERE REQUIRED.

- CLAIMS: ALL CLAIMS OTHER THAN DEMURRAGE, BY EITHER PARTY, TO BE
SUBMITTED
WITHIN 180 DAYS OF COMPLETION OF DISCHARGE OR THEREAFTER BE TIME BARRED.
THE
FACT THAT THE OWING PARTY HAS NOT COLLECTED DEMURRAGE OR RECOVERED
SETTLEMENT
FROM A THIRD PARTY SHALL NOT BE AN EXCUSE OR DEFENSE FOR NON OR DELAYED
PAYMENT
TO OWED PARTY. UNDISPUTED PORTION OF CLAIMS INCLUDING BUT NOT LIMITED TO

DEMURRAGE TO BE SETTLED NOT LATER THAN 60 (SIXTY) DAYS AFTER THE CHARTERERS
RECEIPT OF CLAIM. COPIES OF STANDARD INDEPENDENT INSPECTOR REPORTS AS TO
QUANTITY AND QUALITY FOR AN EVENTUAL CLAIM, BOTH AT LOAD AND DISCHARGE PORTS,
TO BE SENT DIRECTLY BY INSPECTOR TO OWNER AS PER OWNERS INSTRUCTION.

- DEMURRAGE: THE CHARTERERS/OWNERS SHALL PROMPTLY NOTIFY THE OWNERS/CHARTERERS
OF ANY OBJECTIONS TO ANY DEMURRAGE CLAIM UNDER THIS CHARTERPARTY. UNLESS THE
OWNERS/CHARTERERS HAVE RECEIVED SUCH NOTIFICATION WITHIN 45 DAYS AFTER THE
CHARTERERS/OWNER'S RECEIPT OF THE CLAIM/REPLY, THE CHARTERERS/OWNERS SHALL
BE
DEEMED TO HAVE WAIVED OBJECTION TO THE CLAIM/REPLY WHICH SHALL BE DEEMED
ACCEPTED BY THE CHARTERERS/OWNER AS PRESENTED.

- MSDS CLAUSE - CHARTERERS SHALL, BEFORE THE COMMENCEMENT OF LOADING ANY
CARGO
LISTED IN MARPOL ANNEX I, PROVIDE MASTER WITH A MATERIAL SAFETY DATA SHEET
(MSDS) WHICH SHALL CONTAIN SAFETY, HANDLING AND ENVIRONMENTAL INFORMATION IN
ACCORDANCE WITH THE REQUIREMENTS AND RECOMMENDATIONS OF IMO RESOLUTION MSC
150
(77). IF LOADING TERMINAL DOES NOT SUPPLY CHARTERERS WITH SAME THEN CHARTERERS
ARE UNDER NOT RESPONSIBLE TO PROVIDE SAME TO MASTER

- BIMCO AMS/ISPS/AMPD CLAUSES TO BE APPLIED.

ADAM TERMS NOS. 1 - 36 DATED JANUARY 1, 1992 (AMENDED AUG 2002) ATTACHED AND
AMENDED AS FOLLOWS:

-----------------------------------------------------------------

CLS 4 ADD "AMENDED 1990 TO APPLY"

CLS 6 MAXIMUM 3 HOURS AWAITING CARGO DOCUMENTS TO BE FOR OWNERS ACCOUNT
THEREAFTER TIME TO BE FOR CHARTERERS ACCOUNT.

CLS 8 AT 50 PCT ON WS RATES (SEE MAIN TERMS)

CLS 10 ADD AT THE END "TO THE BEST OF OWNERS KNOWLEDGE AT TIME OF FIXING"

CLS 11 LINE 4, AFTER SAFE OPERATIONS, INSERT "THE TRANSHIPMENT LOCATIONS ALWAYS
TO BE SUBJECT TO MASTERS APPROVAL"

LINE 9, BEFORE "TRANSHIPMENT" INSERT "UNLESS OTHERWISE STIPULATED BY WORLDSCALE" ADD AT THE END OF THE CLAUSE "ALL COSTS IN CONNECTION WITH SUCH
LIGHTERING, INCLUDING EXTRA AGENCY FEE, IF ANY, SHALL BE FOR CHARTERER'S ACCOUNT"

CLS 12 IN LINE 6 AFTER "NOT" INSERT "USELESS OTHERWISE STIPULATED BY WORLDSCALE"

CLS 13 2ND PARAGRAPH LINE 3 AND LINE 7, DELETE "OR FIRST CLASS CARGO RECEIVER"

CLS 15 LINE 4, AFTER LIQUID, INSERT "REACHABLE AND PUMPABLE BY VESSELS FIXED PUMPS"

CLS 16 LINE 7, AFTER CHARTER INSERT "AND PAYABLE TOGETHER WITH FREIGHT"

CLS 18 LINE 2, AFTER MAINTAIN "EXCLUDING STRIPPING BUT MAX 4 HOURS"

CLS 19 ADD AT THE END "PROVIDED INSTRUCTIONS INCLUDED IN VOYAGE ORDERS"

CLS 21 2ND PARAGRAPH LINE 1, DELETE "1" INSERT "2" 2ND PARAGRAPH DELETE LAST 2
SENTENCES CLS 23 ADD AT THE END OF THE CLAUSE "TIME AND COSTS FOR DEINERTING
AND REINERTING TO BE FOR CHARTERERS ACCOUNT"   (AGREED)

CLS 25 ADD AFTER 1ST PARAGRAPH "COST PAYABLE WITH FREIGHT AGAINST OWNERS E-MAIL
INVOICE SUPPORTED BY MASTER'S E-MAIL STATEMENT. HARD COPY INVOICE WITH SUPPORTING DOCUMENTS TO FOLLOW" 2ND PARAGRAPH, LINE 1, DELETE "BY ANY MEANS
WHATSOEVER"

CLS 26 ADD AT THE BEGINNING OF THE CLAUSE "VESSEL TO STRIP TANKS WELL AND DRAIN
PUMPS AND LINES AS LAST CARGO NHC" FIRST SENTENCE, DELETE "CLEAN" LINE 2 AND
4
DELETE "AND FURTHER OWNERS ARE REMOVED FROM TANKS"

CLS 29 DELETE PARAGRAPH C AND INSERT "COST PAYABLE WITH FREIGHT AGAINST OWNERS

E-MAIL INVOICE SUPPORTED BY MASTER'S E-MAIL STATEMENT. HARD COPY INVOICE WITH
SUPPORTING DOCUMENTS TO FOLLOW"

CLS 30 THIRD LINE AFTER ACCOUNT INSERT "INCLUDING BUT NOT LIMITED TO PORT
CHARGES. FOURTH LINE AFTER LAYTIME INSERT "TIME TO COUNT FROM ARRIVAL TO
DISCHARGE/RELOAD PORT UNTIL DEPARTURE FROM SAID PORT".  (AGREED)

CLS 31 (SEE SPECIAL PROVISIONS)

CLS 32 OWNERS AGENTS AT LOAD PORT, CHARTERERS AGENTS AT DISPORT ALWAYS
PROVIDED
    COMPETITIVE FEES

CLS 36 1ST PARAGRAPH, LINE 2, AFTER RECAP, INSERT "IF BROKER WILL BE ACTING"

BROKER COMMISSION: 2.5 PCT TO CHARLES R. WEBER FOR DIVISION, PAYABLE BY
OWNERS ON FREIGHT ONLY BASIS THE AFTER FLOPEC RATE DIVIDED BY 1.1 ( NO
COMMISSION
ON DEMURRAGE,OPA,DEVIATION OR ANY EXTRA INCOME)

THANK YOU FOR THE OPPORTUNITY TO CONCLUDE THIS BUSINESS ON YOUR BEHALF

END

REGARDS,

GTE

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

**ASBATANKVOY**

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

| | Place | Date |
|---|---|---|

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and

Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.  Description and Position of Vessel:

Deadweight:            tons (2240 lbs.)        Classed:

Loaded draft of Vessel on assigned summer freeboard       ft.       in. in salt water.

Capacity for cargo:            tons (of 2240 lbs. each)       % more or less, Vessel's option.

Coated:    ☐ Yes    ☐ No

Coiled:    ☐ Yes    ☐ No        Last two cargoes:

Now:        Expected Ready:

B.  Laydays:

Commencing:        Cancelling:

C.  Loading Port(s):        Charterer's Option

D.  Discharging Port(s):        Charterer's Option

E.  Cargo:        Charterer's Option

per ton (of 2240 lbs. each).

F.  Freight Rate:

G.  Freight Payable to:        at

H.  Total Laytime in Running Hours:

APPENDIX 2: FORMS

ASBATANKVOY FORM

I.    Demurrage per day:

J.    Commission of          % is payable by Owner to

      on the actual amount of freight, when and as freight is paid.

K.    The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.    Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.    Special Provisions:

APPENDIX 2: FORMS

ASBATANKVOY FORM

      IN WITNESS WHEREOF, the parties have caused this Charter, consisting a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:                    _____

                                        By: _____


Witness the signature of:                    _____

                                        By: _____

## PART II

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Carribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (or names) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading

---

discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge berth to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for the account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall pay all taxes assessed against the loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of

---

neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

26. ISSUANCE AND TERMS OF BILLS OF LADING.
(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the Owner, shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special

---

account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge— the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of this Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority by or any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risk insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of

loading or discharging; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b). FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14: (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio back for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b). FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any place which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:— any act,

vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any Court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if said arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

---

## BILL OF LADING

Shipped in apparent good order and condition by _____ Steamship/Motorship _____

on board the _____

whereof _____ is Master, at the port of _____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the contract charter dated New York/London _____, as

between _____ and _____

Charterer, and all the terms whatsoever of the said contract charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

_____
Master



# FLOTA PETROLERA ECUATORIANA

## SISTEMA DE GESTION INTEGRAL

### Información entregada a la GAF (PA-25)

| | | | |
|---|---|---|---|
| Documento N° : | GCO-UAOP-2756-07 | Fecha : | 28 de Diciembre de 2007 |

| | | | |
|---|---|---|---|
| VESSEL : | **MAYA** | VOYAGE : | **P:33 F:17 / 2007** |
| CHTRS : | TURKISH PETROLEUM | CPD : | 23 de Noviembre de 2007 |
| BROKER: | CHARLES WEBER | OWNER : | FLOPEC |
| LOADING: | | DISCHARGE: | |
| C/P FORM: | ASBATANKVOY | VESSEL MODE : | **VOYAGE CHARTER** |

## DETENTION AT ESMERALDAS

### DATE INFORMATION

| | |
|---|---|
| NOR tendered as per C/P : | 30-Nov-2007  05:00 HRS |

| | |
|---|---|
| End waiting time at Loading Port : | 03-Dec-2007  00:01 HRS |
| TOTAL TIME LOST : | 67:01:00 Hours |
| Demurrage Rate : | USD  31.500,00 |
| **TOTAL :** | **USD  87.959,37** |

### BUNKERS INFORMATION

| | I.F.O. : | M.D.O. : |
|---|---|---|
| NOR Tendered : | 1.084,70  M/T | 64,30  M/T |
| Supplied : | 0,00  M/T | 0,00  M/T |
| END WAITING : | 1.068,00  M/T | 64,10  M/T |
| CONSUMPTION : | 16,70  M/T | 0,20  M/T |
| PRICES : | USD  446,00 | USD  890,00 |
| SUBTOTAL : | USD  7.448,20 | USD  178,00 |

| | |
|---|---|
| **TOTAL :** | USD  7.626,20 |

| **GRAND TOTAL :** | **USD 95.585,57** |
|---|---|

**REMARKS :**
Adjunto envío los cálculos correspondientes a la DETENCION del BT *Maya* causado por *Turkish Petroleum International Co.Ltd.*, debido a su incumplimiento de levantar su carga en Esmeraldas. Por este motivo el contrato fue cancelado, sin embargo este valor debe ser recuperado del Charteador como compensación a la detención del buque hasta emitir su Nota de Alistamiento NOR para su siguiente contrato.

Form Authority : Ing. Iván Guerr: Revision : 2,0

| Elaborado | Revisado | Aprobado |
|---|---|---|

26:58:00



EXHIBIT

B

Charles R Weber

TO: FLOPEC
ATTN: PILAR/TANIA/MARTHA/ZANDRA

TPIC ORIENTE CGO'S 28-30 NOV

WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE ACCOUNT TPIC WITH ALL
SUBJECTS LIFTED ABD CP DATED TODAY
NOV 23,2007 TERMS AND CONDITIONS AS FOLLOWS

MT CHIMBORAZO   O/O  SUITABLE SUB- TURKISH PETROLEUM - LAYCAN NOV 28-30,
2007 -
ORIENTE CRUDE

CHARTER PARTY DATED: NOV 23,2007

BROKER:       CHARLES WEBER

OWNERS: FLOPEC
        AV. AMAZONAS 1188 Y CORDERO
        EDIFICIO FLOPEC
        APARTADO 535 - A
        QUITO, ECUADOR
        PHONE 593-22-509-703
        E-MAIL: chartering@flopec.com.ec

CHRTRS:  Turkish Petroleum International Co.Ltd
         Registered Address of TPIC
         15 Esplanade St. Helier,
         Jersey Je1 Rb Channel Islands

        OFFICIAL DOCUMENTS SHOULD BE SENT TO
        Communication Adress of TPIC
        Sogutozu Cad. No: 27 06520
        ANKARA/TURKIYE
        fax: 00 90 312 285 38 09

MT CHIMBORAZO   OWNER OPTION SIMILAR SUITABLE SUBSTITUTE SUBJECT TO
CHARTERERS / SUPPLIERS/RECEIVERS APPROVAL, WHICH NOT TO BE UNREASONABLY



EXHIBIT
C

WITHHELD. ANY CHANGES MUST BE MADE WITH SUFFICIENT TIME IN ORDER TO ALLOW
CHARTERERS TO OBTAIN TRAFFIC PERMISSION.


VESSEL PARTICULARS:


DETAILS OF MT CHIMBORAZO


M/T CHIMBORAZO
FLAG: ECUADORIAN
OFFICERS: ECUADORIAN
CREW: ECUADORIAN
DWT: 66,138 MT
DRAUGHT: 12.967 M
LOA: 228.17 M
BEAM: 32.233 M
BUILT: 1999
CLASS: ABS
CAPACITY: 70,769 (M3) 98 PCT
IGS/SBT/VRS: YES/YES/YES
COW: YES
TPC: 67.5
BCM: 115.24
BOOM: 1 X 15
KTM: 46.6 M
COILS: YES
P & I CLUB: WEST OF ENGLAND
T.V.E: FEB 20, 2008
GRT: 35,770
NRT: 20,199
PCNT: 29,616
HULL TYPE: (DOUBLE)
NATURAL SEGREGATIONS: 2

VSL IS FITTED WITH CARGO TANK RADAR LEVEL GAUGE LEVEL SYSTEM VSL FITTED
WITH CLOSE LOADING SYSTEM

QUAL INDL: GALLAGHER MARINE SYSTEM INC.
     100 CENTURY PARKWAY, SUITE 130
     MT. LAUREL, NJ 080504
     UNITED STATES
     TEL 1-703-683-4700
     FAX 1-856-642-3945
     RESPONSE PLAN: OSRO

NATIONAL RESPONSE CORPORATION
3500 SUNRISE HIGHWAY - SUIT T103
GREAT RIVER, NY 11739
PH: (631) 2249141 - FAX: (631) 2249082
ATTN: MIKE REESE

LAST 3 CARGOES:  NAPO / ORIENTE / FUEL OIL
LAST 3 CHRTRS:   ASTRA / GLENPOINT / PMI

APPROVALS: TO THE BEST OWNERS KNOWLEDGE AT THE CURRENT TIME THE VESSEL
IS ACCEPTABLE TO THE FOLLOWING MAJORS: BP, CHEVTEX, REPSOL, SHELL,
EXXONMOBIL

- POSITION: VSL OPEN AT TACOMA ABOUT NOV 16/07, ETA ESMERALDAS NOV
28/07, AGW AND UNEXPECTED CIRCUMSTANCES EXCEPTED.

--------------------CARGO--------------------------------

CARGO: P/C MIN 50,000 MTS CHOPT TO COMPLETE UP TO FULL CARGO ORIENTE CRUDE
OIL AND ALWAYS CONSISTENT WITH SAFE PANAMA CANAL TRANSIT DRAFT,
MAXIMUM TWO
GRADES WITHIN VESSELS NATURAL SEGREGATION, NO HEAT REQUIRED. NO
DEADFREIGHT
CHARTERERS ACCOUNT PROVIDED MINIMUM QUANTITY SUPPLY.


IF DISPORT SAN FRANCISCO, VSL IS ABLE TO LOAD ACCORDING TO MASTER'S
CALCULATIONS ALWAYS CONSISTENT WITH CURRENT SAFE ARRIVAL DRAFT TO S.F.
PINOLE SHOALS, WHICH WILL BE PROVIDED BY CHRTRS TO OWNERS/MASTER IN DUE
TIME, IN
ORDER MASTER CAN PROCEED WITH RESPECTIVE CALCULATION.

-------------------------------------------------------------
- LAYDAYS:  NOVEMBER 28-30, 2007

- LOAD PORT: 1 SP ESMERALDAS


- DISCHARGE PORT:1/2 SP USWC (L.A - S.F. RANGE) OR CHOPT
              1/2 SP USAC IF NY NNGWB EX FLA OR IN CHOPT
              1/2 SP USG EX FLA OR IN CHOPT
              1/2 SP CARIBS EX C/O/H OR IN CHOPT

RATES:

USWC - WS 258.50
USAC-G WS 236.50 (P/P)
CBS   WS 242.00 (P/P)

DEMURRAGE USD 31,500 PD/PR

- OVERAGE: AT 50 PCT ON ABOVE WS RATES

ADDRESS COMMISSION: 1.25 PCT ON THE AGREED RATE DIVIDED BY 1.1 ON FREIGHT
ONLY.

- PANAMA CANAL DELAY: 24 HOURS WAITING TIME FOR OWNERS ACCOUNT.
THEREAFTER
FOR

CHARTERERS ACCOUNT. TIME TO COUNT UPON ANCHOR DOWN UNTIL ANCHOR UP PRIOR
TRANSIT. IF PRE-BOOK FOR PANAMA CANAL TRANSIT IS REQUIRED BY EITHER CHARTERERS
OR OWNER, COSTS TO BE SPLIT 50% BETWEEN OWNERS AND CHARTERERS AND TO BE PAID
ALONG WITH FREIGHT (PROVIDED E-MAIL/FAX SUPPORTING DOCUMENTS SUBMITTED)


- FREIGHT PAYMENT: BBB (BEFORE BREAKING BULK) IN USD BY T/T TO OWNERS
DESIGNATED BANK AS FOLLOWS:
BANCO BILBAO VIZCAYA ARGENTARIA NEW YORK
1345 AVENUE OF THE AMERICAS
45th FLOOR NEW YORK N.Y. 10105
SWIFT CODE : BBV AUS33
FW 026001847
ABA 184 UID 206333
PARA CREDITO A LA
CUENTA NO. 111187-2216-01
BANCO BILBAO VIZCAYA ARGENTARIA (PANAMA), S.A.
SWIFT CODE: BBV APAPA
PARA CREDITO FINAL
A FLOTA PETROLERA ECUATORIANA "FLOPEC"
A/C 01821010193073001


** PERFORMANCE GUARANTEE:

CHARTERERS ARE TO PROVIDE OWNERS WITH AN IRREVOCABLE, UNCONDITIONAL BANK
GUARANTEE PAYABLE AT SIGHT AND RENEWABLE UPON THE REQUEST OF FLOPEC FOR AN
AMOUNT OF U.S. DOLLARS 1,250,000.00 ( ONE MILLION TWO HUNDRED AND FIFTY
THOUSAND DOLLARS ), ISSUED AT FLOPEC'S SATISFACTION BY A FIRST CLASS BANK
AND IN A FORMAT AND IN A WORDING ACCEPTABLE TO FLOPEC.

CHARTERERS ARE TO PROVIDE THIS GUARANTEE NOT LATTER THAN 1200 HRS TUESDAY
NOV 27,2007. ANY TIME SPENT WAITING FOR THE LOC, AFTER THE COMMENCEMENT OF THE
LAYCAN AND PROVIDED THE VESSEL IS IN ALL RESPECTS READY TO LOAD, SHALL COUNT
AS  USED LAYTIME OR AS DEMURRAGE IF VESSEL IS ON DEMURRAGE.

THIS PERFORMANCE BOND (IRREVOCABLE, UNCONDITIONAL BANK GUARANTEE) WILL BE
VALID UNTIL THE FULL AMOUNT OF FREIGHT AND  DEMURRAGE, IF ANY IS PAID,
AFTER WHICH  IT WILL BECOME NULL AND VOID.

CHARTERERS CAN NOT ASSIGN ALL OF ITS RIGHTS AND OBLIGATIONS UNDER THIS
CHARTER PARTY TO ANY AFFILIATE WHICH MAY IN TURN REASSIGN TO ANY OTHER AFFILIATE.
CHARTERERS TURKISH PETROLEUM INT.CO.LTD (TPIC) ALWAYS TO REMAIN

RESPONSIBLE
FOR THE FULFILLMENT OF THIS CHARTER PARTY.

- ELETSON WAITING INSTRUCTION CLAUSE

CHARTERERS TO HAVE THE OPTION TO REQUIRE VESSEL TO WAIT FOR ORDERS FOR A
MAXIMUM OF TWENTY (20) DAYS AT ANCHORAGE AT MASTER'S DISCRETION,
WITHOUT
PREJUDICE TO ANY CLAIM OWNERS MAY HAVE FOR DEVIATION. ALL TIME FROM
ARRIVAL
AT ANCHORAGE UNTIL DEPARTURE TO BE PAID AT THE AGREED DEMURRAGE RATE
FOR THE
FIRST 10 DAYS AND 35,500 USD PDPR FOR THE 2ND 10 DAYS , PLUS EXTRA BUNKERS
CONSUMED (FUEL OIL FOR MAINTAINING CARGO TEMPERATURE AND DIESEL OIL) TO
BE PAID
TOGETHER WITH THE FREIGHT AGAINST OWNERS E-MAILED INVOICE.

SHOULD IT BE NECESSARY FOR VESSEL TO STEAM WHILST AT THE ANCHORAGE AREA
THEN
TIME AND ADDITIONAL BUNKERS CONSUMED IN THIS RESPECT TO BE FOR
CHARTERERS
ACCOUNT AND TO BE PAID AS ABOVE AGAINST OWNERS E- MAILED INVOICE. AFTER
THE
EXPIRATION OF TWENTY (20) DAYS OWNERS HAVE THE OPTION TO NEGOTIATE  ABOVE
RATE.

- C/P FORM: ASBATANKVOY

SPECIAL PROVISIONS:

---------------------

- WSHTC TO APPLY

- NEW YORK / US LAW TO APPLY THROUGHOUT THIS CHARTERPARTY


- CP SPEED - VESSEL TO PERFORM LADEN PASSAGE AT 14 KNOTS WSNP

- OWNERS WILL HAVE THE OPTION TO LOAD BUNKERS DURING VESSEL'S LADEN
PASSAGE
ALWAYS SUBJECT TO CHARTERERS PRIOR APPROVAL WHICH NOT TO BE
UNREASONABLY
WITHHELD

- CHARTERERS TURKISH PETROLEUM INTERNATIONAL CO LTD ALSO WILL PAY
LIGHTHOUSE
AND BUOY DUES (24 CENTS PER GRT) AND CARGO DUES ASSESSED ON THE QUANTITY
OF
CARGO LOADED (5 CENTS PER BBL)

- TOTAL LAYTIME IN RUNNING HOURS 72

- ALL COST FOR LIGHTERING EQUIPMENT SHALL BE FOR THE ACCOUNT OF TURKISH

PETROLEUM INTERNATIONAL CO LTD, IF ANY

- ESCORT TUGS IF REQUIRED TO BE AS PER WSHTC

- L.O.I. AS PER OWNER'S P&I CLUB WORDING

- OWNERS AGENTS AT LOAD PORT, CHARTERERS AGENTS AT DISPORT ALWAYS
PROVIDED
COMPETITIVE FEES.

- OWNERS WARRANT THAT THEY ARE AWARE OF THE REQUIREMENTS OF THE U.S.
BUREAU
OF
CUSTOMS AND BORDER PROTECTION ISSUED ON DECEMBER 5TH. 2003 UNDER
FEDERAL
REGISTER PART II DEPARTMENT OF HOMELAND SECURITY 19 CFR PARTS 4, 103, ET AL.
AND WILL COMPLY FULLY WITH THESE REQUIREMENTS FOR ENTERING U.S. PORTS,
SUBJECT
TO CHARTERERS COOPERATION, WHERE REQUIRED.

- CLAIMS: ALL CLAIMS OTHER THAN DEMURRAGE, BY EITHER PARTY, TO BE
SUBMITTED
WITHIN 180 DAYS OF COMPLETION OF DISCHARGE OR THEREAFTER BE TIME BARRED.
THE
FACT THAT THE OWING PARTY HAS NOT COLLECTED DEMURRAGE OR RECOVERED
SETTLEMENT
FROM A THIRD PARTY SHALL NOT BE AN EXCUSE OR DEFENSE FOR NON OR DELAYED
PAYMENT
TO OWED PARTY. UNDISPUTED PORTION OF CLAIMS INCLUDING BUT NOT LIMITED TO
DEMURRAGE TO BE SETTLED NOT LATER THAN 60 (SIXTY) DAYS AFTER THE
CHARTERERS
RECEIPT OF CLAIM. COPIES OF STANDARD INDEPENDENT INSPECTOR REPORTS AS TO
QUANTITY AND QUALITY FOR AN EVENTUAL CLAIM, BOTH AT LOAD AND DISCHARGE
PORTS,
TO BE SENT DIRECTLY BY INSPECTOR TO OWNER AS PER OWNERS INSTRUCTION.

- DEMURRAGE: THE CHARTERERS/OWNERS SHALL PROMPTLY NOTIFY THE
OWNERS/CHARTERERS
OF ANY OBJECTIONS TO ANY DEMURRAGE CLAIM UNDER THIS CHARTERPARTY.
UNLESS THE
OWNERS/CHARTERERS HAVE RECEIVED SUCH NOTIFICATION WITHIN 45 DAYS AFTER
THE
CHARTERERS/OWNER'S RECEIPT OF THE CLAIM/REPLY, THE CHARTERERS/OWNERS
SHALL
BE
DEEMED TO HAVE WAIVED OBJECTION TO THE CLAIM/REPLY WHICH SHALL BE
DEEMED
ACCEPTED BY THE CHARTERERS/OWNER AS PRESENTED.

- MSDS CLAUSE - CHARTERERS SHALL, BEFORE THE COMMENCEMENT OF LOADING
ANY
CARGO
LISTED IN MARPOL ANNEX I, PROVIDE MASTER WITH A MATERIAL SAFETY DATA
SHEET

(MSDS) WHICH SHALL CONTAIN SAFETY, HANDLING AND ENVIRONMENTAL INFORMATION IN
ACCORDANCE WITH THE REQUIREMENTS AND RECOMMENDATIONS OF IMO RESOLUTION MSC
150
(77). IF LOADING TERMINAL DOES NOT SUPPLY CHARTERERS WITH SAME THEN CHARTERERS
ARE UNDER NOT RESPONSIBLE TO PROVIDE SAME TO MASTER

- BIMCO AMS/ISPS/AMPD CLAUSES TO BE APPLIED.

ADAM TERMS NOS. 1 - 36 DATED JANUARY 1, 1992 (AMENDED AUG 2002) ATTACHED AND
AMENDED AS FOLLOWS:

---------------------------------------------------------------

CLS 4 ADD "AMENDED 1990 TO APPLY"

CLS 6 MAXIMUM 3 HOURS AWAITING CARGO DOCUMENTS TO BE FOR OWNERS ACCOUNT
THEREAFTER TIME TO BE FOR CHARTERERS ACCOUNT.

CLS 8 AT 50 PCT ON WS RATES (SEE MAIN TERMS)

CLS 10 ADD AT THE END "TO THE BEST OF OWNERS KNOWLEDGE AT TIME OF FIXING"

CLS 11 LINE 4, AFTER SAFE OPERATIONS, INSERT "THE TRANSHIPMENT LOCATIONS ALWAYS
TO BE SUBJECT TO MASTERS APPROVAL"

LINE 9, BEFORE "TRANSHIPMENT" INSERT "UNLESS OTHERWISE STIPULATED BY
WORLDSCALE" ADD AT THE END OF THE CLAUSE "ALL COSTS IN CONNECTION WITH SUCH
LIGHTERING, INCLUDING EXTRA AGENCY FEE, IF ANY, SHALL BE FOR CHARTERER'S ACCOUNT"

CLS 12 IN LINE 6 AFTER "NOT" INSERT "USELESS OTHERWISE STIPULATED BY WORLDSCALE"

CLS 13 2ND PARAGRAPH LINE 3 AND LINE 7, DELETE "OR FIRST CLASS CARGO RECEIVER"

CLS 15 LINE 4, AFTER LIQUID, INSERT "REACHABLE AND PUMPABLE BY VESSELS FIXED PUMPS"

CLS 16 LINE 7, AFTER CHARTER INSERT "AND PAYABLE TOGETHER WITH FREIGHT"

CLS 18 LINE 2, AFTER MAINTAIN "EXCLUDING STRIPPING BUT MAX 4 HOURS"

CLS 19 ADD AT THE END "PROVIDED INSTRUCTIONS INCLUDED IN VOYAGE ORDERS"

CLS 21 2ND PARAGRAPH LINE 1, DELETE "1" INSERT "2" 2ND PARAGRAPH DELETE LAST 2
SENTENCES CLS 23 ADD AT THE END OF THE CLAUSE "TIME AND COSTS FOR DEINERTING
AND REINERTING TO BE FOR CHARTERERS ACCOUNT"  (AGREED)

CLS 25 ADD AFTER 1ST PARAGRAPH "COST PAYABLE WITH FREIGHT AGAINST OWNERS E-MAIL
INVOICE SUPPORTED BY MASTER'S E-MAIL STATEMENT. HARD COPY INVOICE WITH
SUPPORTING DOCUMENTS TO FOLLOW" 2ND PARAGRAPH, LINE 1, DELETE "BY ANY MEANS
WHATSOEVER"

CLS 26 ADD AT THE BEGINNING OF THE CLAUSE "VESSEL TO STRIP TANKS WELL AND DRAIN
PUMPS AND LINES AS LAST CARGO NHC" FIRST SENTENCE, DELETE "CLEAN" LINE 2 AND 4
DELETE "AND FURTHER OWNERS ARE REMOVED FROM TANKS"

CLS 29 DELETE PARAGRAPH C AND INSERT "COST PAYABLE WITH FREIGHT AGAINST OWNERS
E-MAIL INVOICE SUPPORTED BY MASTER'S E-MAIL STATEMENT. HARD COPY INVOICE WITH
SUPPORTING DOCUMENTS TO FOLLOW"

CLS 30 THIRD LINE AFTER ACCOUNT INSERT "INCLUDING BUT NOT LIMITED TO PORT
CHARGES. FOURTH LINE AFTER LAYTIME INSERT "TIME TO COUNT FROM ARRIVAL TO
DISCHARGE/RELOAD PORT UNTIL DEPARTURE FROM SAID PORT".  (AGREED)

CLS 31 (SEE SPECIAL PROVISIONS)

CLS 32 OWNERS AGENTS AT LOAD PORT, CHARTERERS AGENTS AT DISPORT ALWAYS PROVIDED
    COMPETITIVE FEES

CLS 36 1ST PARAGRAPH, LINE 2, AFTER RECAP, INSERT "IF BROKER WILL BE ACTING"

BROKER COMMISSION: 2.5 PCT TO CHARLES R. WEBER FOR DIVISION, PAYABLE BY
OWNERS ON FREIGHT ONLY BASIS THE AFTER FLOPEC RATE DIVIDED BY 1.1 ( NO COMMISSION
ON DEMURRAGE,OPA,DEVIATION OR ANY EXTRA INCOME)

THANK YOU FOR THE OPPORTUNITY TO CONCLUDE THIS BUSINESS ON YOUR BEHALF

END

REGARDS,

GTE

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

896

# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

|  | Place | Date |
|---|---|---|

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A. Description and Position of Vessel:

   Deadweight:          tons (2240 lbs.)          Classed:

Loaded draft of Vessel on assigned summer freeboard          ft.          in. in salt water.

Capacity for cargo:          tons (of 2240 lbs. each)          % more or less, Vessel's option.

Coated:     ☐ Yes     ☐ No

Coiled:     ☐ Yes     ☐ No          Last two cargoes:

Now:                                     Expected Ready:

B. Laydays:

   Commencing:                          Cancelling:

C. Loading Port(s):                                     Charterer's Option

D. Discharging Port(s):                                Charterer's Option

E. Cargo:                                               Charterer's Option

                                                        per ton (of 2240 lbs. each).

F. Freight Rate:

G. Freight Payable to:                       at

H. Total Laytime in Running Hours:

APPENDIX 2: FORMS

ASBATANKVOY FORM

897

I.      Demurrage per day:

J.      Commission of          % is payable by Owner to

        on the actual amount of freight, when and as freight is paid.

K.      The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.      Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.      Special Provisions:

APPENDIX 2: FORMS

ASBATANKVOY FORM

        IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:                    _____

                                    By: _____

Witness the signature of:                    _____

                                    By: _____

## PART II

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If loading of the cargo be requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
   (a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:
| ST. KITTS | Carribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

On a voyage to a port or ports in:
| Place | |
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e. finished mooring when at a sealoading or discharging terminal and all fast when loading or

neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner or the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master nor Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING
   (a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain in and leave in safety and always afloat nor for any blockaded port.
   (b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Bill of Lading the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.
   (i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.
   (ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.
   (iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges, General Average agreement and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and be held by him at his risk in a special

[lower half — left column]

discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted to the Charterer for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading to discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage, shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board.All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of

account in a duly authorized and licensed bank at, the place where the General Average statement is prepared.
   (iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.
   (v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.
   (vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of this Bills of Lading be blockaded, or
   (b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of this Charter Party (provided such other port is not blockaded) and that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited. If no such port be available the charges as are received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.
   (c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.
   If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port of discharge or to the port of discharge originally designated to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.
   (vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of

loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which have a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b). FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14; (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel in passage to such laytime; but should the quarantine not be declared until the Vessel is in the port, the Charterer shall not be liable for any resulting delay.

(b). FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's inspector. The Vessel shall not be responsible for any admixture of more than one quality of oil if shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:— any act,

vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made/in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's village record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total dead-weight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

---

## BILL OF LADING

Shipped in apparent good order and condition by _____

on board the _____

                    Steamship
                    Motorship _____

whereof _____ is Master, at the port of _____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

                    contract
This shipment is carried under and pursuant to the terms of the charter dated New York/London _____ as

between _____ and _____
                    contract
Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this

shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplishing, the others will be void.

Dated at _____ this _____ day of _____

                                        Master



# FLOTA PETROLERA ECUATORIANA

### SISTEMA DE GESTION INTEGRAL
#### Información entregada a la GAF (PA-25)

| | | | |
|---|---|---|---|
| Documento N° : | GCO-UAOP-2755-07 | Fecha : | 28 de Diciembre de 2007 |
| **VESSEL :** | **CHIMBORAZO** | **VOYAGE :** | **P:58 F:16 / 2007** |
| CHTRS : | TURKISH PETROLEUM | CPD : | 23 de Noviembre de 2007 |
| BROKER: | CHARLES WEBER | OWNER : | FLOPEC |
| LOADING: | | DISCHARGE: | |
| C/P FORM: | ASBATANKVOY | VESSEL MODE : | *VOYAGE CHARTER* |

## DETENTION AT ESMERALDAS

### DATE INFORMATION

| | |
|---|---|
| **NOR tendered as per C/P :** | 29-Nov-2007  22:00 HRS |
| **End waiting time at Loading Port :** | 07-Dec-2007  00:01 HRS |
| **TOTAL TIME LOST :** | 170:01:00 Hours |
| **Demurrage Rate :** | USD  31,500.00 |
| **TOTAL :** | USD  223,146.88 |

### BUNKERS INFORMATION

| | I.F.O. : | M.D.O. : |
|---|---|---|
| **NOR Tendered :** | 257,00  M/T | 42,00  M/T |
| **Supplied :** | 1.400,00  M/T | 0,00  M/T |
| **END WAITING :** | 1.615,00  M/T | 42,00  M/T |
| **CONSUMPTION :** | 42,00  M/T | 0,00  M/T |
| **PRICES :** | USD  405,00 | USD  0,00 |
| **SUBTOTAL :** | USD  17,010,00 | USD  0,00 |

| | |
|---|---|
| **TOTAL :** | USD  17,010,00 |

| **GRAND TOTAL :** | **USD 240.156,88** |
|---|---|

**REMARKS :**

Adjunto envío los cálculos correspondientes a la **DETENCION** del BT Chimborazo causado por *Turkish Petroleum International Co.Ltd.* , debido a su incumplimiento de levantar su carga en Esmeraldas. Por este motivo el contrato fue cancelado, sin embargo este valor debe ser recuperado del Charteador como compensación a la detención del buque hasta emitir su Nota de Alistamiento NOR para su siguiente contrato.

Form Authority : Ing. Iván Guerra  Revision : 2,0

| Elaborado | Revisado | Aprobado |
|---|---|---|

26:58:00



EXHIBIT

D